STANDARD FORM 61
Revised June 1986
U.S. Office of Personnel Management
FPM Chapter 295
61-106

# APPOINTMENT AFFIDAVITS

UNITED STATES PARK POLICE OFFICER        OCTOBER 7, 2001
*(Position to which appointed)*              *(Date of appointment)*

DEPT. OF THE INTERIOR      NPS           U.S. PARK POLICE
*(Department or agency)*   *(Bureau or Division)*   *(Place of employment)*

I, Michael L. Turner_____, do solemnly swear (or affirm) that—

## A. OATH OF OFFICE

I will support and defend the Constitution of the United States against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; that I take this obligation freely, without any mental reservation or purpose of evasion; and that I will well and faithfully discharge the duties of the office on which I am about to enter. So help me God.

## B. AFFIDAVIT AS TO STRIKING AGAINST THE FEDERAL GOVERNMENT

I am not participating in any strike against the Government of the United States or any agency thereof, and I will not so participate while an employee of the Government of the United States or any agency thereof.

## C. AFFIDAVIT AS TO PURCHASE AND SALE OF OFFICE

I have not, nor has anyone acting in my behalf, given, transferred, promised or paid any consideration for or in expectation or hope of receiving assistance in securing this appointment.

*Michael L. Turner*
*(Signature of appointee)*

Subscribed and sworn (or affirmed) before me this 7TH day of OCTOBER, 2001,

at WASHINGTON                    DISTRICT OF COLUMBIA
*(City)*                          *(State)*

[SEAL]

*Arthur T. Pettiford*
*(Signature of officer)*
Arthur T. Pettiford
Notary Public, District of Columbia
My Commission Expires 05-31-2006

Commission expires 5-31-2006
*(If by a Notary Public, the date of expiration of his/her Commission should be shown)*

NOTE.—The oath of office must be administered by a person specified in 5 U.S.C. 2903. The words "So help me God" in the oath and the word "swear" wherever it appears above should be stricken out when the appointee elects to affirm rather than swear to the affidavits; only these words may be stricken and only when the appointee elects to affirm the affidavits.

NSN 7540-00-634-4015              *U.S Government Printing Office 1992-321-950/60047              Prior Edition Usable

PLT. EXhibit 1

# THE WASHINGTON ORTHOPEDIC CENTER
3 Washington Circle
Suite 110
Washington, D.C. 20037
Telephone: (202) 429-3700   Facsimile: (202) 429-3701

Patient Name: Turner, Michael
Chart number: 13397
Date of injury: 1/30/2002
Date of visit: 21 Jan 2003

## MEDICAL DISABILITY EVALUATION

**Subjective:** This patient was injured on 1/30/2002. He has persistent pain, stiffness, and disability.

**Objective:** Examination of his right upper extremity reveals full passive motion at all joints. Mild deformities are present at the fourth and fifth rays. Hyperhidrosis is present. Grip strength measurements are 40, 40, and 38 kg on the left compared to 26, 26, and 26 kilograms on the right.

**Assessment:** This patient sustained injuries to the supporting structures of the right upper extremity in the injury of 1/30/2002. Maximum medical improvement has been obtained.

**Plan:** Taking into consideration this patient's current symptoms and disability, and utilizing the <u>AMA Guides to the Evaluation of Permanent Impairment, 5th edition</u>, this patient has a 20 percent impairment of right upper extremity function.

Rafael A. Lopez, M.D., F.A.C.S.
Assistant Clinical Professor of Orthopaedic Surgery
George Washington University

PLT. Exh-2.

U.S. DEPARTMENT OF HOMELAND SECURITY
Federal Law Enforcement Training Center
Glynco, Georgia 31524

*Reviewed*
*Michael [signature]*
*12 Nov 03*

LEG 1 (SIS)                                        November 12, 2003


CERTIFIED MAIL

Mr. Michael Turner
USPP – Class 304
Federal Law Enforcement Training Center
Glynco, GA 31524

    Re: Restriction from Access to Federal Law Enforcement Training Center
        (FLETC) Premises

Dear Mr. Turner:

    You are hereby notified, effective immediately, your access to any premises owned, operated, or occupied by, the Federal Law Enforcement Training Center is restricted.

    This restriction is a result of you being involved in at least one incident of workplace violence while a student at the FLETC.

    As stated in the FLETC Directive 67-01, any acts of violence, to include physical attacks, property damage, direct and indirect threats, however communicated, along with any form of intimidation or harassment employed by any means, will not be tolerated and will warrant an immediate response by the FLETC's management officials with the application of the appropriate corrective action.

    Pursuant to FLETC Directive 71-01, the FLETC is a closed Federal facility; access is a privilege, which may be withdrawn.

    In the event you feel you have a legitimate need to enter any FLETC premises, you may contact me, or anyone designated as acting on my behalf, and receive advance approval for your visit. If your request is granted, appropriate arrangements will be made, and you will be informed of the specific restrictions required while you are on the FLETC.

    Should you believe that a compelling reason exists to justify termination of this restriction, you may submit a written request for reconsideration to Kenneth Keene, Deputy Director, FLETC, TH 380, Glynco, GA 31524.

    Failure to comply with this order will constitute a violation of GA Code § 16-7-21, Criminal Trespass, and subject you to prosecution in Federal or State Court.

                          Sincerely,

                            *Donald G. Brewer* [signature]
                            Donald G. Brewer
                            Chief
                            Special Investigations and Security Division

*5/12/03 [signature] USPP*
*D Brewer 5/12/03*
*SI-SIS*

PLT. Exhibit 3



*Federal Law Enforcement Training Center*
U.S. Department of Homeland Security
1131 Chapel Crossing Road
Glynco, Georgia 31524

February 27, 2004

Mr. Morris E. Fischer
Law Offices of Snider & Fischer, LLC
104 Church Lane, Suite 201
Baltimore, MD 21208

Dear Mr. Fischer:

I have reviewed your February 6, 2004 Appeal of Removal from Training concerning your client Mr. Michael L. Turner and his November 13, 2003 removal from training in the USPPI-304 program at the Federal Law Enforcement Training Center (FLETC). I have conducted an in-depth review of the merits of this action. This analysis was based on your contention that the removal was "unusually harsh and unfair" to Mr. Turner.

The basic facts that I considered during my review are as follows:

On the evening of November 8, 2003, Mr. Turner went to the room of fellow student Sean D'Augostine after having several alcoholic drinks. There, he encountered Mr. D'Augostine and another student, Louis Facciponti, sitting in Mr. D'Augostine's room. Yet another student, Mr. Erick May, happened to be standing in the doorway, having stopped by to briefly ask Mr. D'Augostine and Mr. Facciponti if they wanted to go to a store with him. When Mr. Turner approached the room, he began yelling something along the lines of "I know what you did to me behind my back," or words to that effect, pushed past Mr. May, placed his hands on the neck of Mr. D'Augostine, and began choking him. Mr. Facciponti and Mr. May then forcibly removed Mr. Turner from Mr. D'Augostine, pushed him out of the room, and locked the door. Mr. D'Augostine quickly called the FLETC Security Police to report the incident. The officers who arrived took pictures of Mr. D'Augostine that showed he suffered a ripped shirt and red marks on his neck from the altercation.

Two law enforcement officials of the FLETC Special Investigations and Security Division (SISD) subsequently conducted a formal investigation of these allegations in accordance with applicable laws, rules, and regulations pertaining to the operations of the FLETC. The SISD concluded that Mr. Turner had indeed committed the acts alleged by the three eyewitnesses, in violation of FLETC Directives 67-01 (dealing with workplace violence) and 67-35.C (dealing with student misconduct).

PLT. Exhibit 4   1 of 2

www.fletc.gov

2

In addition, it appears Mr. Turner was not completely forthcoming during his interview as he made several allegations that have turned out to be false.

I am satisfied that the allegations have been substantiated by a preponderance of the evidence. I am also satisfied that removal from training was the appropriate action in this case given the serious nature of the incident. Accordingly, your appeal and request for a formal reprimand, reinstatement, and completion of the training in question (in lieu of removal) on behalf of Mr. Turner are denied.

Sincerely,

Bruce J. Bowen
Assistant Director, Training Directorate

# Law Offices of
# Snider & Fischer, LLC

Michael J. Snider, Esq.
Morris E. Fischer, Esq.

March 18, 2004

Mr. Michael L. Turner
214 V. Street, NE
Washington, DC 2002

Re: FLETC

Dear Michael:

Thank you for stopping by our office yesterday to discuss your matter. This is to confirm your decision to pursue arbitration with your union rather than pursue MSPB rights. I have enclosed a copy of the final correspondence I received from FLETC regarding their decision not to reinstate you. The letter does not list any appeal rights. I contacted FLETC to determine if any are given to you and have not heard back from them. I would strongly advise that you bring this to your union rep's attention as soon as possible.

We wish you the best of luck in all future endeavors.

Sincerely,

Morris E. Fischer, Esq.

Exhibit 5



# Law Offices of
# Snider & Fischer, LLC

Michael J. Snider, Esq.
Morris E. Fischer, Esq.

March 25, 2004

Mr. Michael L. Turner
214 V. Street, NE
Washington, DC 20002

Via Overnight Mail

Re: FLETC

Dear Michael:

Today, your union representative contacted me and advised that it was his belief that the decision from FLETC dated February 27, 2004, was in fact a final agency decision. In my opinion, that is debatable, since no appeal rights are listed and described to you. However, in any event, to avoid all possible pitfalls in your case, I strongly recommend that you consider it as such and if you desire to file a lawsuit against FLETC, to do so in Federal District Court by Monday, March 29, 2004.

As per our discussions last week and my March 18, 2004 letter, we had both decided that your new legal representative would be your union representative. Consequently, I would suggest that any further questions regarding this should be directed to him.

We wish you the best of luck in all future endeavors.

Sincerely,

Morris E. Fischer, Esq.

Exhibit 6



104 Church Lane • Suite 201 • Baltimore, Maryland 21208
410.653.9060 phone • 410.653.9061 fax • 1-800-DISCRIMINATION^SM • info@sniderlaw.com

UNITED STATES DEPARTMENT OF THE INTERIOR
NATIONAL PARK SERVICE
UNITED STATES PARK POLICE
INTERNAL AFFAIRS CASE NARRATIVE

CASE # _____
IAU FILE # ███████ ex. 2
DATE: 11/08/03

INTERVIEW ☐   RECORDS ☐   INVESTIGATIVE OPERATION ☐   TAPED ☐

INVESTIGATOR: ███████████   LOCATION OF INTERVIEW: _____

## Case Summary

On 11/15/04 Mr. Michael Turner, a former United States Park Police recruit, emailed two complaints to the Department of the Interior Office of the Inspector General (DOI OIG). These complaints were referred to the United States Park Police by the DOI OIG on February 2, 2005. The first complaint entails an allegation of physical assault against Mr. Turner by three United States Park Police officers on November 8, 2003, while attending the Federal Law Enforcement Training Center in Glynco, Georgia **(Allegation #1)**. The second complaint entails an allegation that Mr. Turner was inappropriately removed from the FLETC as a result of an inadequate investigation **(Allegation #2)**. Named in the second complaint were Retired USPP ███████ who was the Commader, FLETC, at the time of the incident), Former Deputy Chief ███████ (who was the Commander of the Field Offices Division at the time), and Retired Assistant Chief ███████.

**Allegation #1:**      **Physical Assault**

The FLETC Special Investigations and Security Division (SISD) conducted a comprehensive investigation into the incident that occurred on November 8, 2003. (Investigation attached). This physical altercation between USPP Recruits ███████████████████ and Michael Turner occurred at dormitory building 277, room 158 within the confines of the Center. This investigation indicated that there was a preponderance of the evidence that USPP Recruit Turner had violated the FLETC Workplace Violence Directive. As such, Mr. Turner was removed from training and subsequently separated from employment with the United States Park Police based upon his failure to complete the requirements of the Recruit Training Program.

**Allegation #2:**      **Inappropriate Removal/Inadequate Investigation**

Mr. Turner's removal from FLETC was based upon the findings of the FLETC SISD investigation and his subsequent removal from Federal Service was based upon his failure to complete the requirements of the Recruit Training Program. Mr. Turner's removal from Federal Service was upheld by the Merit Systems Protection Board (MSPB) on October 6, 2004. (MSPB decision attached).

The United States Park Police initiated an Administrative Complaint ███████ attached) against Mr. Turner concerning the incident. Based upon the recommendation of the DOI Solicitor's Office, this administrative investigation was suspended pending the MSPB review and determination. Subsequent to Mr. Turner's affirmed removal from Federal Service the USPP Administrative Complaint was closed, with no further action.

*Based upon these facts and circumstances, it is my recommendation that the aforementioned allegations be UNFOUNDED.*

All Deletions X-6/7 Unless Marked Otherwise     2/8/05     Exhibit 7

PAGE 1 OF 1

INVESTIGATOR'S SIGNATURE ███████     REVIEWING SUPERVISOR ███████   2-15-05

SDI, NPS, USPP FORM 43-07 (1/92)

FORM NO. 10-344
(REV. 3-79)

## U.S. DEPARTMENT OF THE INTERIOR
### NATIONAL PARK SERVICE
### SUPPLEMENTARY CASE/INCIDENT RECORD

| ORGANIZATION (PARK) NAME | CASE/INCIDENT NUMBER |
|---|---|
| United States Park Police | ███████ ex-2 |

| LOCATION OF INCIDENT | DATE OF INCIDENT MO DA YR |
|---|---|
| Federal Law Enforcement Training Center Glynco, GA 31524 | 11 08 03 |

NATURE OF INCIDENT

Administrative Complaint

| COMPLAINANT'S NAME | COMPLAINANT'S ADDRESS |
|---|---|
| ███████ Office of Training Manangement | Federal Law Enforcement Training Center 1131 Chapel Crossing Road Glynco, GA 31524 |

**RESULTS OF INVESTIGATION**

**All Deletions X-6/7 Unless Marked Otherwise**

**Recruit Officer involved:** Michael L. Turner, badge #387

**Alleged violation:** General Order 31.01, section IV. A. states:
"An officer shall refrain from conduct that impairs the efficiency of the Force or causes the loss of public confidence in the Force."

General Order 31.01, section IV B states:
"An officer shall maintain decorum, command of temper, and exercise patience and discretion at all times. Harsh, violent, profane, or insolent language shall not be used. The officer shall conduct himself/herself in a professional manner."

General Order 31.01, section IV C states:
"An officer shall not engage in criminal, infamous, dishonest, immoral, or notoriously disgraceful conduct prejudicial to the Government (5 CFR 735.209)

**Complaint:** On 11/08/2003 at about 2330 hours, I was informed by Recruit Officer ███ that an incident had occurred in Recruit Officer ███████ dorm room. Recruit Officer ███ told me that Recruit Officer ███████ had attacked Recruit Officer ███████ and hurt Recruit Officer ███████ neck. At 0018 hours on 11/09/2003 Recruit Officer ███████ left a message on my cell phone indicating that █ had called Fletc Security about the incident.

On 11/09/2003, Fletc Security began an investigation into the events of 11/08/2003. Written statements had been taken from Recruit Officers Turner, ███████ and ███████ on scene the night of the incident. Recruit Officers ███████ and ███████ were interviewed by investigators for Fletc on 11/10/2003. Recruit Officer Turner was interviewed on 11/12/2003. All interviews were tape-recorded. Present in each interview was Officer ███████ who was acting as Union representative.

Special Investigations and Security Division restricted in writing Recruit Officer Turner from Fletc property. Recruit Officer Turner was escorted to his room to collect personal items for that evening. Recruit Officer Turner handed over his Fletc ID and vehicle pass to Security. I secured Recruit Officer Turner's DOI badge, his Recruit ID, his cap badge, and his room key. Recruit Officer Turner was escorted a local hotel in Brunswick for the night. Recruit Officer Turner was advised by Sgt. ███████ and ███████ that █ would contact him when Fletc officials made a determination as to the continuation of his training on Center.

Exhibit 8 1of 2    1 of 2.

| SUBMITTED BY (SIGNATURE AND DATE) | APPROVED BY (SIGNATURE AND DATE) |
|---|---|
| ███████ 17/2003 | ███████ 11/20/03 |

U.S. DEPARTMENT OF THE INTERIOR
NATIONAL PARK SERVICE
SUPPLEMENTARY CASE/INCIDENT RECORD

| ORGANIZATION (PARK) NAME | CASE/INCIDENT NUMBER |
|---|---|
| United States Park Police | [redacted] |

| LOCATION OF INCIDENT | DATE OF INCIDENT |
|---|---|
| Federal Law Enforcement Training Center, Glynco GA 31524 | MO 11 / DA 08 / YR 03 |

NATURE OF INCIDENT

Administrative Complaint

| COMPLAINANT'S NAME | COMPLAINANT'S ADDRESS |
|---|---|
| [redacted] Office of Training Management | Federal Law Enforcement Training Center 1131 Chapel Crossing Road Glynco, GA 31524 |

RESULTS OF INVESTIGATION

On 11/13/2003, Recruit Officer Turner was served with written notice that he was dismissed from training at Fletc. Recruit Officer Turner was then served with a memo by Captain [redacted] directing him to report to the Training Branch Office in Washington, DC on Monday, November 17, 2003 at 0900 hours.

**All Deletions X-6/7
Unless Marked Otherwise**

p.2 of 2

| SUBMITTED BY (SIGNATURE AND DATE) | APPROVED BY (SIGNATURE AND DATE) |
|---|---|
| [redacted] | [redacted] 11/20/03 |

PLT- Exh 8 2 of 2

 

# UNITED STATES PARK POLICE

# INTERNAL AFFAIRS

## NOT SUSTAINED

## UNFOUNDED

## EXONERATED

## SUSTAINED

## OTHER _____

**RESTRICTED**
INVESTIGATIVE REPORTS
PRIVACY ACT APPLICABLE

PLT. Exh 1 of 6

# INTERNAL AFFAIRS UNIT

The Internal Affairs unit makes prompt and thorough investigations of Force members for alleged or suspected misconduct, violations of laws, or infractions of United States Park Police rules and regulations. Investigations may be prompted from information received within the Force or from the public. The objective of the Internal Affairs Unit is to gather information to assist management in facilitating the prompt and just resolution of disciplinary actions.

The Unit also maintains liaison with the National Capital Region Personnel Office and the National Capital Regional Director's Office on all matters that involve disciplinary and adverse actions relating to the U.S. Park Police. The Unit is also responsible for responding to Freedom of Information Act (FOIA) requests.

## EDWIN DELATTRE'S VIEW ON POLICE CORRUPTION AND ETHICS
(Part Of Course Presentation By Michael Ramage, General Counsel Florida Department of Law Enforcement)

It takes a good person to be a good police officer, but being a good person is not enough. To be ethical, police officers must be thoroughly competent to perform and accomplish their rightful work...(W)hen an employee performs incompetently, this reflects badly on the character and judgment of the people who hired him and supervise his work. Leaders themselves are supposed to be accountable, at least to the extent they have authority for decisions about hiring, job assignment, supervision, promotion, discipline and termination....

"(I)ntegrity" means "wholeness." Certainly, habits of honesty merit attention, not only because they are essential to integrity, but also because failures of honesty, whether in falsified reports, perjury, or financial corruption, can decimate both individual police careers and entire police departments. But integrity embraces much more than honesty. Integrity means wholeness of character, living in fidelity to the same principles of decency in both public and private, no matter whether we fear that anyone might catch us doing wrong...being the same person in public and private, behaving well even when we have no fear of being caught....

Command personnel from a number of departments tell me they estimate that as many as 20 percent of their own sworn personnel use illegal drugs. Some say that cocaine is the drug of choice, and they naturally suspect corrupt involvement of a high percentage of the police who use it...Occasionally, gang women make sexual advances to officers who foolishly accept their favors, and are thereafter compromised in gang and narcotics enforcement. Some police accept gifts of drugs from gangs and thereafter compromise investigations and service of warrants, thus betraying other police....

Some departments that lack the money to do decent background investigations hire personnel who are vulnerable to the temptations of easy money from the moment they become police. Not surprisingly, some reported corruption is traceable to plain, ordinary greed....Some police take because they have become convinced that the war on drugs is a failure, that everybody is making out except them. They decide that they might as well get rich, too.

✗ Likewise, the pattern of what I call "noble-cause" corruption seems to be continuing...(police who treat) themselves above the law...skimming narcotics money to buy equipment needed by the department—weapons, hardware, and so on—and sooner or later, somebody takes a little for himself. Then everybody involved in the initial idea that "my ends are so noble that they justify illegal means" starts taking for private gain, and the initial excesses in the name of a noble cause become selfish excess—plain and simple stealing, even drug trafficking. Such behavior routinely involves falsifying reports and giving perjured testimony; and even if starts out well-intentioned, though foolish, it is morally and spiritually corrosive....

✗ Police leaders are now learning that "noble cause" corruption problems often begin with other and different police abuses of authority. Some police start the slide by making stops for which they have neither reasonable suspicion nor probable cause and exceed their authority in conducting searches and raids, manhandling suspects, and submitting false reports to cover up.

Too often, pressure from above to rid the streets of perpetrators leads to superiors looking the other way from such violations, tolerating misconduct such as

1

a shift to get overtime compensation, and so on. Some of this feeds on the rationalization that "the system doesn't work," and, naturally, once the supervisor is implicated in tolerance of wrongdoing, his moral authority is corroded, making it difficult or impossible for him to dig in to prevent other kinds of wrongdoing later....

The future of policing is squarely in the hands, minds, and hearts of today's police leaders. Much depends on the fortitude they bring to bear against the downside trends of our age...The new police and staff to whom leaders must transmit a concept of policing and the public trust, the ideals and aspirations of public service, will have been raised in the climate of public opinion and behavior I have described. They will need the best possible mentors, because they will already have been exposed to much in our society that has no respect for and no drive toward becoming the best at anything....

Police departments will, of necessity, be drawing candidates from a student population, 30 percent of whose members now unabashedly announce that they cheat, and that they consider cheating a perfectly respectable means of getting where they want to go. For this great mass of young people, dishonest methods of getting ahead do not even raise a question. In one poll of a prestige midwestern university, 91 percent of the students said they had cheated in college....

No institution of any kind can rise above the quality of the individuals who make it up and the quality of individuals depends on the quality of their character and of their judgment...Just as institutions depend on individuals, individuals should be able to depend on their institutions...institutions that really prize high standards of conduct, (and who) will stand by those who behave honorably, even when their actions are neither popular nor customary, or when they make honorable mistakes. Where this does not happen, the best people may prefer to lie low, leaving the self-defeating impression that within the institution, people really do have to 'go along to get along." In such ground, corruption grows like a weed....

Nothing is incorruptible except personal character that will not be corrupted, a second nature of moral excellence that is beyond temptation. Few human beings ever reach this level of moral excellence in every respect, and it is not cynical to be realistic about human frailties and weaknesses in the face of temptation. Still, the aspiration to integrity—to justice, temperance, courage, honesty—and to wisdom ennobles all who achieve it and all who acquire the settled disposition to heed moral reason in the conduct of their lives.

Edwin J. Delattre, "Against Brutality and Corruption: Integrity, Wisdom, and Professionalism."

mrr/a:\delattre

2

 **MISSION AND GENERAL POLICY STATEMENTS OF THE UNITED STATES PARK POLICE** 

V. **PROFESSIONALISM**

A professional police officer maintains the highest standards of honesty, integrity, and conduct. (S)he knows the limits of his/her authority and does not resort to illegal means to accomplish his/her duties. (S)he is obligated to be knowledgeable of the law and of his/her responsibility in enforcing it. ***The standards of conduct expected of police officers are greater than that expected of the public*** (emphasis added). Officers should avoid questionable behavior. Succumbing to the numerous temptations to which an officer is subjected is a sign of weakness.

***In his/her private life, a professional police officer should exemplify the traits of stability, fidelity, and morality.***
In his/her profession, the officer should conduct him/herself in a manner which instills respect for the law and the police service, and inspires confidence and trust. (S)he does not allow him/herself to be personally offended or to become emotionally involved in any controversy. (S)he does not accept gifts, favors, or gratuities which may be interpreted by the public as influencing his/her judgement in the performance of his/her duty.

Nothing does more to enhance the image of the police officer and the Force and to elicit public cooperation than to be courteous and helpful. Officers must refrain from lecturing, scolding, humiliating, or inconveniencing the unintentional offender for minor violations; instead, they should be understanding.



IN REPLY REFER TO

# United States Department of the Interior

NATIONAL PARK SERVICE
**UNITED STATES PARK POLICE**
Headquarters
1100 Ohio Drive, SW
Washington, D.C. 20024
<u>REVERSE GARRITY WARNING</u>

This is an administrative interview being conducted by <u>Sgt. PETER BARROW</u> and <u>SGT. M. GONZALEZ</u> related to the official business of the United States Park Police. Being interviewed is <u>JOHN JONES</u>. This interview is being mechanically recorded and will become an official record of the United States Park Police. The questioning is in regards to <u>99-032</u>.

We are not questioning you for the purpose of instituting a criminal prosecution against you. During the course of this questioning, if you disclose information which indicates that you may be guilty of criminal conduct, neither your self-incriminating statements nor the fruits of any self-incriminating statements you make will be used against you in any criminal legal proceedings.

Since this is an administrative matter and any self-incriminating information you may disclose will not be used against you in a court of law, you are required to answer our questions fully and truthfully. If you refuse to answer our questions, this in itself is a violation of Federal regulations, and you will be subject to disciplinary penalties, including termination.

**Weingarten-Section 7114(a) of the Act of 1978 states that:**

"(2) an exclusive representative of an appropriate unit in an agency shall be given the opportunity to be represented at-
"(B) any examination of an employee in the unit by a representative of the agency in connection with an investigation if-
"(i) the employee reasonably believes that the examination may result in disciplinary action against the employee,"
"(ii) the employee requests representation."

Do you understand what has just been explained to you? _____

Do you have any questions concerning what has just been explained to you? _____

We now order you to answer the following questions:

Received: _____

Date: _____

Witness: _____